## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

KAREN DRAGON,
     Plaintiff,

     v.

STATE OF CONNECTICUT, JUDICIAL
BRANCH,
     Defendants.

No. 3:14-cv-749 (MPS)

## MEMORANDUM OF DECISION

### I.     Introduction

Plaintiff Karen Dragon ("Ms. Dragon"), a judicial marshal for the Judicial Branch of the State of Connecticut brings a hostile work environment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*, against the State of Connecticut and the State of Connecticut Judicial Branch ("the defendants"). The Court earlier dismissed Ms. Dragon's discrimination and retaliation claims. (ECF No. 39.) Defendants now move for summary judgment on her remaining hostile work environment claim, arguing that Ms. Dragon has not provided enough evidence to warrant a trial. For the reasons stated below, I DENY the Motion for Summary Judgment.

### II.     Factual Background

Based on their Local Rule 56(a) statements, the parties agree on Ms. Dragon's work history, which I will summarize.[1]

Ms. Dragon is an employee of the State of Connecticut Judicial Branch. (Defendant's Local Rule 56(a)1 Statement, ECF No. 55-2 ("Def.'s L.R. 56(a)1 Stmt.") ¶ 1; Plaintiff's Local

---

[1] Neither party complied properly with the requirements of Local Rule 56. The defendants' L. Civ. R. 56(a)(1) statement does not list facts in a concise manner with appropriate citations to the record. The plaintiff also fails to cite any part of the record properly, using citations such as "T" and not citing appropriate pages.

Rule 56(a)2 Statement, ECF No. 61-2 ("Pl.'s L.R. 56(a)2 Stmt.") ¶ 1-2.)  Ms. Dragon began working in the Windham County Judicial District in 2000, and was primarily assigned to the Windham County Judicial District until 2013.  (Def.'s L.R. 56(a)1 Stmt. ¶ 2; Pl.'s L.R. 56(a)2 Stmt. ¶ 1-2.)  She was initially hired as a Special Deputy Sheriff with the Sheriff's Department in 1999, and was reclassified as a Judicial Marshal II with the State of Connecticut Judicial Branch on December 1, 2000, pursuant to Public Act 00-99.  (Def.'s L.R. 56(a)1 Stmt. ¶ 1; Pl.'s L.R. 56(a)2 Stmt. ¶ 1-2.)  She was reclassified as a Judicial Marshal on June 24, 2005.  (*Id.*)  Ms. Dragon was promoted to Lead Judicial Marshal on May 7, 2010.  (*Id.*)  In July 2010, Ms. Dragon began rotating assignments between Windham County and the Judicial Marshal Academy (the "Academy").  (*Id.*)  Ms. Dragon was promoted to a Supervising Judicial Marshal in November 2013, and at that time she was assigned to work primarily at the Academy.  (*Id.*)

The parties also agree that the Judicial Branch has well-published workplace anti-discrimination and anti-harassment policies and complaint procedures.  (Def.'s L.R. 56(a)1 Stmt. ¶ 21; Pl.'s L.R. 56(a)2 Stmt. ¶ 21.)  Ms. Dragon has read and signed these policies, and is aware of the complaint process.  (*Id.*)

The parties disagree about most of the facts that make up Ms. Dragon's hostile work environment claim.  I will discuss the facts in chronological order, and note where the parties agree.[2]

---

[2] I note that Ms. Dragon has restated the allegations in her Amended Complaint as facts in support of her claims.  (Pl.'s L.R. 56(a)(2) Stmt., ECF No. 61-2 at 4.)  In her deposition, Ms. Dragon swore and affirmed that everything in her amended complaint was true and accurate.  (Transcript of Deposition of Karen Dragon, ECF No. 61-3 at 12.)  While normally a "nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment," *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir.2006), I will treat her amended complaint as an affidavit because she has sworn to the truth of it, and will accept as true all allegations in the complaint about which she is competent to testify.  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule [56(c)(4)].").

Ms. Dragon alleges that she and her mother, Carol Sandoval ("Ms. Sandoval"), were the first two Hispanic female judicial marshals hired by the Defendants in Windham County. (Amended Complaint, ECF No. 24 at ¶ 13.)  Ms. Dragon states that after she was hired she was denied employment opportunities available to other non-Hispanic male marshals.[3]  In particular, Ms. Dragon requested training to obtain her Commercial Driver's License ("CDL") so that she could be posted to transport duties and receive a raise.  (Def.'s L.R. 56(a)1 Stmt. ¶ 3; ECF No. 55-4 at 8.)  Ms. Dragon began CDL training in May 2002, but in April 2003 formal CDL training ceased.  (ECF No. 55-4 at 88.)  In discontinuing the program, the Judicial Branch stated that "Judicial Marshals who are in the process of obtaining their CDL and need to use a vehicle will be allowed to do so on their own time.  Such vehicle usage shall be coordinated through the Judicial Marshal Academy office."  (*Id.*)  Plaintiff alleges that while white, male marshals in the same district and position as she were allowed to use official vehicles to continue practicing, in particular Marshal Gaudette and Marshal Murphy, her requests to do so were denied.  (*Id.* at 8-9.)  Ms.

---

[3] In her Complaint and Response to Interrogatories, Ms. Dragon also claimed that she was not allowed to work in "lockup" from 2000-2006, and was instead assigned to monitor a metal detector on the third floor where "there was nothing going on" and a "courtroom assignment here or there or the hallway."  (Compl., ECF No. 24; Pls. Response to Interrogatories, ECF No. 61-4 at 17; Defs. Ex. 1, Excerpts from Deposition of Karen Dragon, ECF No. 55-4 at 7.) When asked in her deposition if she ever worked lockup from 2000-2006 she said she could not recall.  (ECF No. 55-4 at 7.)  She was asked three times about her claim that she was not allowed to work lockup, and all three times she said that she could not recall.  (*Id.* at 7-8.)  The exchange included the following:

> Q.  So, you're saying from 2000 to 2006, you never worked lockup, is that what you're saying?
> A.  You're saying it.  I'm not.  I said I don't recall.

(*Id.*)  The defendants allege that Ms. Dragon did work lockup as part of her rotations as a Judicial Marshal, and note that assignments are at the discretion of the Chief Marshal.  (Def.'s L.R. 56(a)1 Stmt. ¶ 3.)  In support of this, they have provided an affidavit from the Chief Judicial Marshal, Russell Downer, who states that Ms. Dragon did work lockup from 2000-2006.  (Defs. Ex. 3, Affidavit of Russell Downer, Jr., ECF No. 55-4 at 119.)  Ms. Dragon has not raised a genuine issue of material fact on this issue, because it is well settled that "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969).  Despite the fact that Ms. Dragon filed the complaint before her deposition, and verified it at her deposition, the same principle applies.  Ms. Dragon was given three opportunities to discuss her claim about lockup, and each time responded that she could not recall.

Dragon did not take CDL training until 2006, when it was offered again to all marshals. (*Id.* at 10.) She did not file a grievance about not receiving the training earlier. (*Id.* at 9.)

Ms. Dragon also claims that she was denied promotions in favor of non-Hispanic marshals with less seniority and education prior to 2009. (Pl.'s L.R. 56(a)(2) Stmt., ECF No. 61-2 at 6.) She alleges that she applied three times for a promotion and was not even provided an opportunity to interview. (*Id.*) She testified that openings were announced at roll call, that interested candidates were to submit a statement of interest to the Chief, and that she did so. (ECF No. 55-4 at 14-17.) She could not recall the exact dates she applied and did not have the letters of interest that she submitted. (*Id.*)

The defendants argue that Ms. Dragon never applied for a promotion before 2009. In support of this, they have submitted a record showing applications received from Ms. Dragon, which shows applications on December 10, 2009, for Lead Judicial Marshal and two applications submitted for Supervising Judicial Marshal in April and September 2013. (Def.'s Ex. 4, ECF No. 55-4 at 90.) They have also submitted an affidavit from Linda Dow, the Human Resource Manager for the Judicial Branch since 2005, who states that the records show that Ms. Dragon applied only once for the position of Lead Judicial Marshal. (Def.'s Ex. 2, ECF No. 55-4 at 78.) The defendants have also submitted an affidavit from Chief Marshal Downer stating that he never received any letters of interest from Ms. Dragon concerning a promotion to Lead Judicial Marshal. (ECF No. 55-4 at 119.)

In 2006, Ms. Dragon heard Lead Judicial Marshal Gaudette call an inmate a "spic" in her presence. (ECF No. 55-4 at 18.) She pulled him aside to tell him that the language offended her, though it was not directed towards her. (*Id.*) The defendants do not dispute this event occurred. (Def.'s L.R. 56(a)1 Stmt. ¶ 6.) In January 2012, Supervisor Gaudette called Ms. Dragon into his

4

office and told her that she was not allowed to speak Spanish at work, claiming that two other marshals—both white, non-Hispanic males—had been offended when she spoke Spanish to her mother.  (ECF No. 55-4 at 20; ECF No. 61-2 at 6.)   Ms. Dragon was surprised as she had often been asked to translate at work by judges when official translators were not available and in lockup when Spanish speaking inmates needed to be directed.  (ECF No. 55-4 at 20; ECF No. 61-2 at 6.) She complained to Chief Downer, telling him that she was offended.  (ECF No. 55-4 at 21.)  She testified at her deposition that the Chief told her not to worry about it and "brushed it off."  (*Id.* at 24.)  Defendants provide an affidavit from Chief Marshal Downer averring that it is the "practice" of the Judicial Branch that English be the primary language for safety and security reasons, and that "[j]udicial marshals are not to conduct private conversations in any languages other than English while conducting their official duties."  (Def.'s L.R. 56(a)1 Stmt. ¶ 10; Def.'s Ex. 3, ECF No. 55-4 at 120.)  Ms. Dragon also agreed in her deposition that English is the primary language of the Judicial Branch, but stated that there is no documentation setting forth a formal policy.  (ECF No. 61-3 at 38-39.)

In 2010, when Ms. Dragon was promoted to Lead Judicial Marshal, she alleges that other non-Hispanic judicial marshals, including Judicial Marshal Robinson, who is a white male, were upset, gave her the "silent treatment," and disregarded her orders.  (ECF No. 55-4 at 25-28.) Robinson in particular "took the scheduling" that she had "handed out" and "crumbled it up and threw it in the garbage" "in front of everyone."  (*Id.* at 26.)   She complained about this to Supervisor Tercjak and Marshal Gaudette.  (*Id.* at 27.)

After Ms. Dragon was promoted, Judicial Marshal Brian Griffin told her it was only because she was Puerto Rican.  (*Id.* at 18.)  The judicial marshals believed that Marshal Jeffrey Thibault, who is a white male, was going to receive the promotion, and after he did not they were

upset.  (*Id.* at 19.)  She complained about the behavior of the other marshals to Supervisor Tercjak and Supervising Marshal Gaudette.  (*Id.* at 27.)  She alleges that Supervisor Tercjak stated that they were acting that way because they believed Marshal Thibault was going to get the promotion. (*Id.* at 19.)

In 2012, Ms. Dragon, working as a lead judicial marshal, wrote up Marshal Germaine Gilbert, a non-Hispanic female, for abandoning her station at work.  (*Id.* at 72.)  Marshal Gilbert became confrontational with Ms. Dragon, raised her voice, and waved her finger in Ms. Dragon's face.  (ECF No. 61-2 at 8.)  Supervisor Tercjak instructed Ms. Dragon to write up the incident and submit it to Chief Marshal Downer.  She did so, but Chief Marshal Downer instructed her to discard it, as she did not need to put her complaint in writing.  (*Id.*)  The defendants submit that only supervising judicial marshals have the authority to write up another judicial marshal.  (Def.'s Ex. 3, ECF No. 55-4 at 119.)

On April 27, 2012, Marshal Gilbert filed a complaint with the Judicial Branch's Administrative Services Division Human Resource Management Unit.  (ECF No. 55-4 at 94.)  She alleged that Ms. Dragon, who had undergone cosmetic breast surgery, displayed before and after photos of her bare breasts to Gilbert and other court personnel.  (*Id.*)  Program Manager Mark Ciarciello investigated the complaint, interviewing Marshal Gilbert, the other court personnel that she identified, and Ms. Dragon.  (*Id.*)  After investigating, Ciarciello substantiated the complaint. (*Id.*)  Marshal Gilbert, Marshal John Dempsey, Patricia Lajoie, and Jennifer Green all stated that Ms. Dragon had displayed the pictures.  (*Id.*)  Ms. Dragon told Ciarciello that a group of marshals were attempting to get her fired, and were filing this false complaint to do so.  (*Id.* at 96 n.1)  She denied the allegations and told Ciarciello that "a lot of marshals . . . have a hard time with her, an

Hispanic female" being promoted to Lead Judicial Marshal.  (ECF No. 61-2 at 10.)  Ms. Dragon

continues to assert that the marshals were falsifying information.  (*Id.* at 8-9.)

As a result of the substantiation of the complaint, Ms. Dragon received a "written warning"

on August 30, 2012.  (ECF No. 55-4 at 51.)  The written warning remained in her personnel file

for one year.  (ECF No. 61-3 at 45-46.)  Defendants assert that under the Collective Bargaining

Agreement, a written warning is not discipline.  (ECF No. 55-4 at 99.)  The Collective Bargaining

Agreement states the following about "written reprimands:"

**Article XII**
**Discipline**

**Section 1**. *Types of Discipline.* Discipline includes discharge, demotion, suspension
without pay, denial of a pay increase due to misconduct, or letter of reprimand, of
an employee who has attained non-probationary status. No such discipline shall be
imposed without just cause.

...

**Section 3.**  *Written reprimand.*  Written reprimands and performance appraisal
references thereto, if any, shall be removed from the employee's personnel file one
(1) year from the date of issuance provided that no other disciplinary incident
occurs during that period of time.

Written reprimands shall not be grievable, unless and until used as grounds, in
whole or in part, for other disciplinary action, or it constitutes the basis of a decision
not to select an employee for a promotion as defined in this Agreement.

(*Id.*)  The portion of the CBA in the record does not reference "written warnings."  (*Id.*)  Ms.

Dragon did not lose any pay or benefits as a result of the warning.  (ECF No. 61-3 at 46-47.)

However, she interpreted the August 30, 2012 "written warning" as discipline, and was

embarrassed that she had to have conversations about her surgery with her supervisors.  (ECF No.

61-3 at 46.)  She alleges that Marshal Gilbert and Marshal Dexter were telling courthouse

personnel that Ms. Dragon was showing photos of her bare breasts.  (*Id.* at 55-56.)  She states that

7

the rumor went to the Clerk's Office, the Probation Office, and the States Attorney's Office.  (*Id.* at 53.)

After her complaint that the marshals were falsifying information to get her fired, Ciarciello spoke with one of the witnesses, Building Supervisor James Canney.  (ECF No. 55-4 at 102.)  Mr. Canney told Ciarciello that after his interview in the investigation of Ms. Dragon, Marshal James Dexter approached him to ask what he told the investigator about Ms. Dragon. When Mr. Canney told Marshal Dexter that he had not seen the pictures, Marshal Dexter allegedly told him that he should have offered a different version of events so that Ms. Dragon would be fired.  (*Id.*)  Ciarciello observed the interaction on courthouse security tapes, and substantiated Ms. Dragon's complaint about Marshal Dexter.[4]   (*Id.* at 103.)  Mr. Canney told Ciarciello that it was difficult to come forward because he was worried that others would label him a "tattle."  (*Id.*)  Ms. Dragon alleges that other marshals labeled Mr. Canney a "rat" as a result of the investigation. (ECF No. 61-2 at 10.)  Marshal Dexter received a "written reprimand," because regardless of what he said to Mr. Canney, he was prohibited from discussing an ongoing investigation with anyone else.  (ECF No. 55-4 at 107.)  Mr. Ciarciello did not investigate Ms. Dragon's claims that the story about her showing photos of her surgery was a fabrication.[5]  (*See* ECF No. 55-4 at 96 n.1.)

At the time she complained to Ciarciello about the marshals falsifying information, Ms. Dragon alleges that she also complained to him about other problems, including not being

---

[4] Ciarciello's report on Canney's complaint states that Marshal Dexter was also interviewed as part of the investigation into Marshal Gilbert's complaint, but he does not mention Marshal Dexter in that report.

[5] The parties have provided the report from Marshal Gilbert's complaint and a report investigating Marshal Dexter for speaking with Building Supervisor Canney during the investigation of Marshal Gilbert's complaint.  (ECF No. 55-4 at 94-96, 102-105.)  Other than the report about Marshal Dexter, for which Ciarciello interviewed only Building Supervisor James Canney and Marshal Dexter, there is no evidence in the record of any further investigation into Ms. Dragon's claims that the marshals were falsifying information to get her fired.  (*Id.* at 102-103.)  Therefore, either the report of a full investigation of Ms. Dragon's claim about the marshals falsifying information is missing from the record, or the investigation did not occur.

promoted and the silent treatment from the other marshals. (ECF No. 61-3 at 50.)  She does not recall if she stated that she was being harassed because of her race or gender.  (*Id.*)  Ciarciello states that no such complaint was made.  (ECF No. 55-4 at 124.)

In April 2012, Ms. Dragon began rotating between her assignment in Windham County and working three days a week at the Judicial Marshal Academy in Hartford, Connecticut.  In August 2012, she began working at the Academy five days a week.  (*Id.* at 110.)  On September 17, 2012, Ms. Dragon filed a complaint against Supervising Judicial Marshal Bruce Lincoln, an instructor at the Academy.  (*Id.* at 109.)  She complained that she felt uncomfortable with statements and Facebook posts made by Lincoln that referenced the sexual harassment policy. (*Id.*)   She also told the investigator that she believed the prior investigation about the photos she had allegedly shown in Windham County contributed to "the current environment" of which she was complaining at the Academy in Hartford.  (*Id.* at 110.)  Ms. Dragon complained that Lincoln made repeated comments to her about "607 violations," referencing the Judicial Branch's sexual harassment policy and, she believes, the earlier investigation concerning the photos.  (*Id.*)  The report of investigation states as follows:

- [Supervising Judicial Marshal ("SJM") Lincoln stated:] "While you are on vacation in Puerto Rico you should wear a full turban so that you don't have a #607 violation."
- When a male JMS [Judicial Marshal Service] instructor was removing his uniform shirt to his white shirt for training purposes, SJM Lincoln commented that "we should be careful that we do not have a #607 violation."
- LJM [Lead Judicial Marshal] Dragon stated that SJM Lincoln made 2-3 comments a day everyday [sic] since she's been reporting to the Academy full time in August 2012.
- On September 7, 2012 at approximately 2:30 p.m. SJM Lincoln called LJM Dragon-over to his desk to show her a picture he had posted (at 2:29 p.m.) on his personal Facebook account. Ms. Dragon viewed the picture and post and described it as:
  - A picture drawing of a woman with the statement: "Sometimes when I feel down, I remember I have big boobs and it makes everything better."

- o  In addition to the picture comments, SJM Lincoln added the following personal message: If you aren't tagged here please don't take it personally or think that I think you have small boobs... just don't wanna create an 607 violations!! [sic]
- o  LJM Dragon stated that she is "friends" with SJM Lincoln on Facebook and that she has access to the photo and post on her phone. Prior to this investigator's meeting, she provided screen shots of the Facebook posts to Marilyn Arroyo, Court Planner with the JMS Academy, who forwarded them to Division Personnel Manager Maria Kewer

(*Id.* at 110.)  "[Ms.] Dragon stated that . . . Lincoln's references to #607 embarrassed her and made her feel uncomfortable."  (*Id.*)  The report of investigation also documented interviews with other witnesses, including John Henri, a supervising judicial marshal.  Henri stated that he had witnessed Lincoln's repeated comments regarding #607 violations and "made the inference" that the comments referred to Dragon's involvement in the earlier investigation concerning the photos of her breasts.  (*Id.* at 111.)

Human Resources substantiated the complaint and Marshal Lincoln was issued a written reprimand on December 28, 2012.  (*Id.* at 116.)  He remained assigned to the Academy with Ms. Dragon.  (ECF No. 61-3 at 59.)  Although this is not mentioned in this report of investigation, Ms. Dragon also testified that Marshal Lincoln made comments to her such as "if [her] husband wasn't making [her] happy at home, that he would be more than happy to step in."  (ECF No. 61-3 at 56.)  He also made comments about her relationship with her "only other female coworker" Michelle Salmon:

> And then he was making his verbal comments when I have a coworker, the only other female coworker, Michelle Salmon, he would ask me what am I eating. And I'd say "Salmon." And he would make a comment, like, "Can I watch?"

(*Id.*)

In her deposition and summary judgment papers, Ms. Dragon raises for the first time another complaint that she made against Marshal Lincoln in November 2015.  (ECF No. 61-3 at

15.)   I will not consider this new allegation because it is raised for the first time in response to a Motion for Summary Judgment.  *See Wilson v. City of N.Y.,* 480 Fed.Appx. 592, 594 (2d Cir.2012) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.") (internal quotation marks omitted).  Furthermore, Ms. Dragon never moved to amend or file a supplemental complaint to include this new incident, despite the fact that she testified about it in her deposition on December 4, 2015. (ECF No. 61-3 at 1.)

### III.    Procedural History

Ms. Dragon filed her complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the EEOC on February 21, 2013.  After receiving her right-to-sue letter on June 16, 2014 (Am. Compl., Ex. A), she filed this action alleging Title VII and state-law claims.  (ECF No. 1.)  I dismissed her state-law claims as barred by the Eleventh Amendment but allowed her to file an amended complaint demonstrating that she had adequately exhausted her administrative remedies as to her Title VII claims.  *Dragon v. Connecticut*, No. 3:14-cv-749, 2014 WL 6633070 (D. Conn. Nov. 21, 2014).  Ms. Dragon filed an amended complaint (ECF No. 24), and defendants moved to dismiss it for failure to state a claim.  (ECF No. 31.)  I dismissed her discrimination and retaliation claims, but not her hostile work environment claim.  (ECF No. 39) The defendants then filed the present Motion for Summary Judgment as to the hostile work environment claim.  (ECF No. 55.)

### IV.    Legal Standard

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving

party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000) (citation omitted). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks and citation omitted). On summary judgment, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013) (quotation marks and citation omitted).

### V.    Discussion

#### A.  Time Period

While many of Ms. Dragon's discrimination allegations are time-barred for the purposes of Title VII discrimination or retaliation claims[6], I may consider them for purposes of evaluating her hostile work environment claim.  Because a hostile work environment claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,' it does not matter that some of the component acts fall outside the statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002).  "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for the purposes of determining liability." *Id.*  There are four acts that contribute to the claim and occurred within the filing period:   (1) Marshal Gilbert raised her voice and wagged her

---

[6] Ms. Dragon's discrimination and retaliation claims were dismissed after the Court granted the Defendants' Motion to Dismiss on June 25, 2015.  (ECF No. 39.)

finger at Ms. Dragon after disobeying her orders, and Chief Downer told Ms. Dragon to discard her write-up of the incident; (2) Marshal Gilbert filed a complaint against Ms. Dragon regarding Ms. Dragon's alleged breast-surgery-related comments; (3) the allegations related to the investigation of Ms. Dragon, the subsequent "discipline," and the alleged failure to investigate the allegedly fabricated reports against her; and (4) Supervisor Lincoln's Facebook comments and other behavior.  Thus, I may consider the entire time period of the hostile environment.

### B.  Hostile Work Environment

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citation omitted).  "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."  *Id*. at 23.  "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id*.

In addition, "[t]here is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment." *Alfano v. Costello*, 294 F.3d 365, 379 (2d Cir. 2002). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id*. at 374 (quoting reference omitted). "Proving the existence of a hostile work environment involves showing both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Feingold*, 366 F.3d at 150 (quoting reference omitted).

"A hostile work environment claim [under Title VII] requires a showing [1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Lewis v. State of Connecticut Dep't of Corr.*, 355 F. Supp. 2d 607, 621 (D. Conn. 2005) (*citing Alfano v. Costello,* 294 F.3d 365, 373–74 (2d Cir.2002)).

### 1.  Abusive Working Environment

Drawing all reasonable inferences in Ms. Dragon's favor, I find that she has submitted enough evidence to raise a genuine dispute of material fact and thus to withstand the Defendants' Motion for Summary Judgment.  While defendants have presented affidavits and other evidence disputing Ms. Dragon's allegations, they have not shown that there are no genuine issues of material fact.  The parties agree on very little, and it is up to a jury to weigh the credibility of the witnesses to determine whether Ms. Dragon was subjected to a hostile work environment.

Three incidents stand out in my assessment of whether there is sufficient evidence in the record to support a reasonable juror's finding of an abusive working environment.  First, there is some evidence that a group of subordinate judicial marshals maneuvered to have Ms. Dragon fired for allegedly showing photos of her bare breasts to court personnel.  Ms. Dragon testified that the marshals, in particular Marshal Dexter, fabricated the story, and she informed the investigator of this claim.  While Ms. Dragon told the Human Resources investigator that this was a fabrication, he substantiated the complaint against her and issued her a written warning.  Although Defendants dispute that this was discipline, a reasonable juror could find that it was.  The written reprimand section in the CBA appears in the "Discipline" section of the agreement, and reasonably fits the description of the letter she received (except that hers was called a "written warning").  Ms. Dragon believed it was discipline.  In any event, Ms. Dragon has submitted evidence that, when it is

14

construed in the light most favorable to her, would permit a reasonable juror to find that her subordinate marshals tried to sabotage her because of their displeasure at having a female Hispanic supervisor. *See Raniola v. Bratton,* 243 F.3d 610, 619–20 (2d Cir. 2001) ("Evidence of workplace sabotage can be relevant to claims of a hostile work environment.").

Second, there is some evidence that this same group of marshals spread a rumor about the photos around the courthouse, as well as to judicial marshals at the Academy in Hartford. Ms. Dragon testified that the rumor reached not only other marshals, but also personnel in the Clerk's Office, the Probation Office, and the States Attorney's Office. (ECF No. 61-3 at 53.) Both Marshal Lincoln and Marshal Henri learned of the rumor even though they were stationed at the Academy in Hartford. (ECF No. 55-4 at 110-111.) Ms. Dragon believed that Marshal Lincoln's comments stemmed from the written warning she received because of the story about the photos, and Marshal Henri also stated that he drew the same "inference." (*Id.* at 110, 111.)

Finally, Marshal Lincoln's Facebook postings and comments support Ms. Dragon's hostile work environment claim. Marshal Lincoln made repeated comments to Ms. Dragon, over the course of two months, about her past # 607 violation, # 607 violations more generally, her marriage, her body, and her relationship with a female coworker. Over the course of two months, Ms. Dragon was subjected to lewd and humiliating comments such as:

> And then he was making his verbal comments when I have a coworker, the only other female coworker, Michelle Salmon, he would ask me what am I eating. And I'd say "Salmon." And he would make a comment, like, "Can I watch?" And then he made other inappropriate comments that if I couldn't, if my husband wasn't making me happy at home, that he would be more than happy to step in.

(ECF No. 61-3 at 56.) Furthermore, Ms. Dragon felt embarrassed because she believed the references to # 607 violations were because of the # 607 violation she received on the basis of a fabricated story. (ECF No. 55-4 at 110.)

Furthermore, these three incidents do not stand alone, and must be evaluated in light of other evidence of discriminatory intent in the record.  I consider, for example, Ms. Dragon's claims that she was not trained and not promoted on the basis of her race and sex in evaluating her hostile work environment claims, because "in assessing the overall hostility of a workplace, charges of discrimination must be considered cumulatively in order to obtain a realistic view of the work environment." *Miller v. City of New York*, 177 F. App'x 195, 197 (2d Cir. 2006) (internal quotation marks and citations omitted).

Ms. Dragon testified that she has been denied training opportunities and promotions throughout the course of her employment with the Judicial Branch.  She testified that she was not allowed to obtain her CDL while white male marshals were.   Although the program was discontinued in 2003, there was an exception to allow those marshals already in the process of training to use court vehicles to practice on their own time.  Ms. Dragon states that she asked to do this, as she had already started training, and her requests were denied, while the requests of white, male marshals were granted.  The defendants have not provided any evidence contradicting this.  Ms. Dragon also testified that she was denied promotions.  While the defendants have provided a document purporting to show she submitted no applications before 2009, the document does not unequivocally show that.  (ECF No. 55-4 at 90.)  Because the document does not state when the system started recording applications, it is possible that the system went into effect only in 2009.  (*Id.*)  Linda Dow's affidavit does not change this analysis, and merely creates an issue of fact.  (*Id.* at 76-78.)  The same is true of Chief Marshal Downer's affidavit stating that he did not receive any letters of interest.  (*Id.* at 118.)

These disputed facts, combined with the evidence that Ms. Dragon heard an inmate called a "spic" in her presence, was told she was promoted only because she was Puerto Rican, was

directed not to speak Spanish pursuant to an unwritten "practice" of which she was never previously informed, and faced hostile treatment by other, subordinate marshals after her promotion because she was a Hispanic female, show that there are genuine issues of fact with regard to whether Ms. Dragon's workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment.  Taking all this evidence together, and construing it in the light most favorable to Ms. Dragon, a reasonable jury could find that she was subjected to severe and pervasive abuse that constituted a hostile work environment.

Further, the evidence permits an inference that the alleged harassment interfered with her work performance.  She alleges that other marshals routinely ignored her directions and gave her the silent treatment, and that her complaints to her supervisors were ignored.  She was subjected to an embarrassing investigation, in which her subordinates attempted to get her fired.  And regardless of whether the written warning was discipline, it was included in her file, and based on the CBA could have affected her had she been investigated for another infraction.

It is worth noting that Ms. Dragon is not required to show that race and gender were the only motivating factors for the harassment; she "needed to show only that a reasonable fact-finder could conclude that race . . . [or sex] was *a* motivating factor in the harassment."  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 23 (2d Cir. 2014).  Ms. Dragon has submitted enough evidence from which a reasonable juror could find that she met that burden.

Ms. Dragon has also provided evidence that she satisfies the subjective element of her claim, as she testified that she perceived her work environment to be abusive and filed complaints to her supervisors alleging the same.  (ECF No. 61-3 at 59.)

### 2.  Basis for Imputing Liability to the Judicial Branch

17

Ms. Dragon has submitted no evidence that her harassers were her supervisors under *Vance v. Ball State University*.  "[A]n employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.,* to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Vance v. Ball State University*, 133 S. Ct. 2434, 2443 (2013).  While some of Ms. Dragon's harassment came at the hands of marshals who held higher ranks than she, she has provided no evidence to suggest that any of them could have taken tangible employment actions against her.

Consequently, the Judicial Branch is liable only if it negligently permitted the hostile work environment. *Id.* at 2439.  In this context, a plaintiff proves an employer's negligence by showing that the employer "'failed to provide a reasonable avenue for complaint' or that 'it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (cited in *Vance*, 133 S. Ct. at 2441 n.1, as a case applying the rule for liability for coworker harassment). *See also Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63–64 (2d Cir. 1998) ("The question of when an official's actual or constructive knowledge will be imputed to the employer is determined by agency principles.").

To show negligence, Ms. Dragon must "show that (1) *someone* had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." *Duch*, 588 F.3d at 763. The reasonableness of the employer's response is determined from the totality of the circumstances, including the gravity of the harm, the employer's response in light of its resources,

and the work environment. *Id.* at 766 (citing *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998).

I find that there is a genuine issue of fact regarding the Judicial Branch's negligence. Since 2012, Human Resources has been aware of Ms. Dragon's complaints, in particular that other marshals, unhappy with her promotion because she was a woman and Hispanic, gave her the silent treatment, ignored her orders, and created a rumor about her breast enhancement surgery to get her fired. Furthermore, a reasonable juror could infer that while this rumor circulated in the courthouse and to marshals throughout the state, Human Resources disciplined Ms. Dragon instead of thoroughly investigating her complaint that the story was a fabrication. The report of investigation into Ms. Dragon notes that the investigator followed up on Ms. Dragon's allegations in a separate report. (ECF No. 55-4 at 96 n.1.) The defendants have submitted evidence of only one other investigation, however, which focused on Marshal Dexter's behavior and conversation with Building Supervisor Canney. There is nothing in the record showing that they otherwise investigated Ms. Dragon's claim that the marshals had fabricated information about her breast-related surgery or spread such information throughout the courthouse. A reasonable jury could thus determine that the Judicial Branch was negligent for failing to follow up fully on her complaints. The investigator found that Marshal Dexter had indeed spoken with a witness to the earlier investigation, which supported Ms. Dragon's claims. But there is no evidence that the investigator followed up with the other witnesses to determine if the problem went any further, and if the entire report about Ms. Dragon was false. Instead, he recommended discipline for both Marshal Dexter and Ms. Dragon. If Ms. Dragon's claims are credited, then the complaint system at the Judicial Branch was being used to effectuate the harassment. Finally, although it is not clear whether Ms. Dragon complained about all of the conduct by Marshal Lincoln, and specifically his

19

lewd remarks about Ms. Dragon and her female co-worker, Defendants do not even address this evidence.  They do not, for example, make any attempt to show that the investigator was unaware of Marshal Lincoln's comments about the female co-worker.  In short, the record does not so clearly show that the Judicial Branch's response to the harassment was reasonable that no reasonable juror could find otherwise.

**VI.    Conclusion**

For the reasons above, I DENY Defendants' Motion to Summary Judgment.  The parties shall submit a joint trial memorandum in accordance with the undersigned's instructions (available on the Court's website) on or before November 15, 2016.  Should the parties wish to proceed to mediation, they shall file a joint statement certifying that (1) counsel have conferred with their clients and each other, (2) the parties wish to proceed to mediation, (3) the parties are willing to participate in settlement efforts at such mediation in good faith, and (4) counsel believe that a mediation stands at least a reasonable chance of resolving the case without trial on or before October 13, 2016.  If they do so, the Court will suspend the deadline for filing the joint trial memorandum until 45 days from the conclusion of any unsuccessful mediation.  Jury selection is set for June 14, 2017.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
            September 29, 2016

20